(/DEFAULT.ASPX)

EXHIBIT
1

Civil
Case Information
Nineteenth Judicial Circuit of Barbour County

20-C-43
Judge: SHAWN D NINES
JULIE CROSTON EXECUTRIX VS. MONSANTO COMPANY

**Plaintiff(s)**
                    **Plaintiff Attorney(s)**
CROSTON, JONATHAN C ESTATE
CROSTON, JULIE A
CROSTON, JULIE A EXECUTRIX
                    C. BRIAN MATKO, ESQ.

**Defendant(s)**
                    **Defendant Attorney(s)**
MONSANTO COMPANY
                                        N/A

Date Filed: 12/29/2020
Case Type: GENERAL CIVIL
Appealed: 0
Final Order Date: N/A
Statistical Close Date: N/A

| Line | Date | Action / Result |
| --- | --- | --- |
| 0001 | 12/29/2020 | CASE FILED |
| 0002 | 12/29/2020 | PL CIVIL CASE INFORMATION STATEMENT |
| 0003 | 12/29/2020 | COMPLAINT WITH EXHIBIT A |
| 0004 | 12/30/2020 | SUMMONS TO DEFENDANT |
| 0005 | 12/30/2020 | MAILED TO SEC/STATE: SUMMONS TO MONSANTO COMPANY STAMPED RETURN, |
| 0006 | | 2 COPIES OF COMPLAINT W/SUMMONS ATTACHED, DATE STAMPED COPY OF |
| 0007 | | PL'S CCIS, CHECK |
| 0008 | 01/08/2021 | SEC/STATE RETURN: SERVICE ACCEPTED FOR MONSANTO CO 1/5/21 |



These materials have been prepared by the Office of the Clerk of the various Circuit Courts from original sources and data believed to be reliable. The information contained herein, however, has not been independently verified by the Office of the Clerk or Software Computer Group, Incorporated. The Office of the Clerk of the Circuit Courts and Software Computer Group, Inc. assume no liability for the accuracy, completeness, or timeliness of the information contained herein.

Software Computer Group | PO Box 27 | Fraziers Bottom WV 25082

**null / ALL**
**Transmittal Number: 22539914**
**Date Processed: 01/11/2021**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Anne Troupis (Monsanto)<br>Bayer U.S. LLC<br>800 N Lindbergh Blvd<br>Saint Louis, MO 63167-1000 |

| | |
|---|---|
| **Entity:** | Monsanto Company<br>Entity ID Number  2282193 |
| **Entity Served:** | Monsanto Company |
| **Title of Action:** | Croston, Julie A. vs. Monsanto Company |
| **Matter Name/ID:** | Croston, Julie A. vs. Monsanto Company (10809846) |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Wrongful Death |
| **Court/Agency:** | Barbour County Circuit Court, WV |
| **Case/Reference No:** | 20-C-43 |
| **Jurisdiction Served:** | West Virginia |
| **Date Served on CSC:** | 01/08/2021 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | Secretary of State in WV on 01/05/2021 |
| **How Served:** | Certified Mail |
| Sender Information: | Hunter B. Mullens<br>304-457-9000 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



**Mac Warner**
Secretary of State
State of West Virginia
**Phone:** 304-558-6000
886-767-8683
**Visit us online:**
www.wvsos.com

USPS CERTIFIED MAIL™



9214 8901 1251 3410 0003 0512 17

MONSANTO COMPANY
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

| | |
|---|---|
| **Control Number:** 268263 | **Agent:** Corporation Service Company |
| **Defendant:** MONSANTO COMPANY | **County:** Barbour |
| 209 West Washington Street | **Civil Action:** 20-C-43 |
| Charleston, WV 25302 US | **Certified Number:** 92148901125134100003051217 |
| | **Service Date:** 1/5/2021 |

I am enclosing:

**1 summons and complaint**

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, **not to the Secretary of State's office.***

Sincerely,

*Mac Warner*

Mac Warner
Secretary of State

**IN THE CIRCUIT COURT OF**     **BARBOUR**     **COUNTY, WEST VIRGINIA**

## CIVIL CASE INFORMATION STATEMENT
### (Civil Cases Other than Domestic Relations)

**I. CASE STYLE:**

| | |
|---|---|
| **Plaintiff(s)** | **Case No.** 20-C-43 |
| JULIE A. CROSTON, individually and as | **Judge:** Nines |
| Executrix of the ESTATE OF JONATHAN | |
| CORREL CROSTON | **Plantiff's Phone:** 304.457.9000 |
| **vs.** | |
| **Defendant(s)** | **Days to Answer**   **Type of Service** |
| MONSANTO COMPANY | 30   Sec. of State |
| Name | |
| 209 West Washington Street | **Defendant's Phone:** |
| Street Address | ~~Barbour County Circuit Clerk~~ |
| Charleston, WV 25302 | |
| City, State, Zip Code | |

FILED
DEC 29 2020

**II. TYPE OF CASE:**

- [✔] General Civil
- [ ] Mass Litigation *[As defined in T.C.R. 26.04(a)]*
  - [ ] Asbestos
  - [ ] FELA Asbestos
  - [ ] Other:
- [ ] Habeas Corpus/Other Extraordinary Writ
- [ ] Other:

- [ ] Adoption
- [ ] Administrative Agency Appeal
- [ ] Civil Appeal from Magistrate Court
- [ ] Miscellaneous Civil Petition
- [ ] Mental Hygiene
- [ ] Guardianship
- [ ] Medical Malpractice

**III. JURY DEMAND:** [✔] Yes [ ] No   CASE WILL BE READY FOR TRIAL BY (Month/Year): 02 / 2022

| **IV. DO YOU OR ANY OF YOUR CLIENTS OR WITNESSES IN THIS CASE REQUIRE SPECIAL ACCOMMODATIONS?** <br> [ ] Yes [✔] No | **IF YES, PLEASE SPECIFY:** <br> [ ] Wheelchair accessible hearing room and other facilites <br> [ ] Reader or other auxiliary aid for the visually impaired <br> [ ] Interpreter or other auxiliary aid for the deaf and hard of hearing <br> [ ] Spokesperson or other auxiliary aid for the speech impaired <br> [ ] Foreign language interpreter-specify language: <br> [ ] Other: |
|---|---|

| | |
|---|---|
| Attorney Name: Hunter B. Mullens | **Representing:** |
| Firm: MULLENS & MULLENS, PLLC | [✔] Plaintiff   [ ] Defendant |
| Address: 9 North Main Street, P.O. Box 95, Philippi, WV 26416 | [ ] Cross-Defendant   [ ] Cross-Complainant |
| Telephone: 304.457.9000 | [ ] 3rd-Party Plaintiff   [ ] 3rd-Party Defendant |
| [ ] **Proceeding Without an Attorney** | |

Original and   03   copies of complaint enclosed/attached.

Dated: 12 / 29 / 2020    Signature: _____

**SCA-C-100: Civil Case Information Statement (Other than Domestic Relations)**     Revision Date: 4/2020

**IN THE CIRCUIT COURT OF BARBOUR COUNTY, WEST VIRGINIA**

JULIE A. CROSTON individually, and
as Executrix of the ESTATE OF
JONATHAN CORREL CROSTON,

    *Plaintiff,*

v.                                 Civil Action No. 20-C-43

MONSANTO COMPANY
and JOHN DOES 1-5,

    *Defendant.*

                           **SUMMONS**

TO:   **Monsanto Company**
       **c/o Corporation Service Company**
       **209 West Washington Street**
       **Charleston, WV  25302**

        IN THE NAME OF THE STATE OF WEST VIRGINIA, you are hereby summoned and required to serve upon Hunter B. Mullens and Mullens and Mullens, PLLC, Plaintiff's attorney, whose address is 9 North Main Street, P.O. Box 95, Philippi, WV  26416, an Answer, including any related counterclaim you may have, to the Complaint filed against you in the above-styled civil action, a true copy of which is herewith delivered to you.  You are requested to serve your answer with thirty (30) days of service of this Summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the Complaint and you will thereafter be barred from asserting in another action any claim you may have which must be asserted by counterclaim in the above-styled civil action.

Dated: 12/30/2020

                                        Clerk of Court

## IN THE CIRCUIT COURT OF BARBOUR COUNTY, WEST VIRGINIA

**JULIE A. CROSTON individually, and
as Executrix of the ESTATE OF
JONATHAN CORREL CROSTON,**

    *Plaintiff,*

v.                                                                Civil Action No. 20-C-43

FILED

DEC 2 9 2020

**MONSANTO COMPANY
and JOHN DOES 1-5,**

Barbour County Circuit Clerk

    *Defendant.*

## COMPLAINT

    **COMES NOW** the Plaintiffs, Julie A. Croston individually and as Executrix of the Estate of Jonathan Correl Croston, by and through their counsel, Hunter B. Mullens, C. Brian Matko and Mullens & Mullens, PLLC, and, upon information and belief, submits the following as their Complaint.

## NATURE OF CASE

    1.   This Civil Action is for the damages suffered by Plaintiffs (collectively referred to as "Plaintiff") as a direct and proximate result of the Defendant's careless, reckless, negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, labeling, distribution and sale of the herbicide known as "Roundup", containing the alleged carcinogenic chemical "glyphosate" and/or a carcinogenic formulate which includes glyphosate.

2.     "Roundup" refers to all formulations of Defendant Monsanto's and Defendant Bayer AG's Monsanto Roundup products, including, but not limited to, Roundup Concentrate Poison Ivy and Tough Brush Killer 1, Roundup Custom Herbicide, Roundup D-Pak herbicide, Roundup Dry Concentrate, Roundup Export Herbicide, Roundup Fence & Yard Edger 1, Roundup Garden Foam Weed and Grass Killer, Roundup Grass and Weed Killer, Roundup Herbicide, roundup Original 2k herbicide, Roundup Original II herbicide, roundup Pro Concentrate, Roundup Quik Stik Grass & Weed Killer, Roundup Quikpro Herbicide, Roundup Rainfast Concentrate Weed & Grass Killer, Roundup Rainfast Super Concentrate Weed & Grass Killer, Roundup Ready-to-Use Extended Control Weed & Grass Killer 1 Plus Weed Preventer, Roundup Ready-to-Use Weed & Grass Killer, Roundup Ready-to-Use Weed & Grass Killer 2, Roundup Ultra Dry, Roundup Ultra Herbicide, Roundup Ultramax, Roundup VM Herbicide, Roundup Weed & Grass Killer Concentrate, Roundup Weed & Grass Killer Concentrate Plus, Roundup Weed & Grass Killer Ready-to-Use Plus, Roundup Weed & Grass Killer Super Concentrate, Roundup Weed & Grass Killer 1 Ready-to-Use, Roundup WSD Herbicide, and Deploy Dry Herbicide, or any other formulation of containing the active ingredient glyphosate.

3.     Plaintiff maintains that "Roundup" is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce. Further, Plaintiff alleges that said "Roundup" lacked all the proper and necessary warnings as to the associated risks, harm, and damages with its use and exposure.

2

## I.  JURISDICTION AND VENUE

4.     Jurisdiction is proper in this matter because the Plaintiff's claims are brought under West Virginia common and/or statutory law.

5,     Venue is proper in Barbour County, West Virginia pursuant to W.Va. Code §§ 56-1-1 *et seq.*

## II.  PARTIES

6.     The Plaintiff, Julie A. Croston, is the widow of Plaintiff-decedent Jonathan Croston, and she presently resides in Philippi, Barbour County, West Virginia.

7.     Julie Croston was duly appointed as the executrix and personal representative of Jonathan Croston's estate.  *See* attached Exhibit No. 1 - Certified copy of Letter of Administration.

8.     Defendant, Monsanto Company, an indirect wholly owned subsidiary of Bayer AG, is a Delaware corporation, with a principal place of business at 800 North Lindbergh Blvd., St. Louis, Missouri, and regularly conducts business in the State of West Virginia and Barbour County.

9.     In June of 2018, Defendant Monsanto Company merged with KWA Investment Co., an indirect subsidiary of Bayer AG in a $63 billion-dollar acquisition

10.     Defendant Monsanto Company's "Roundup" products continues to be sold, distributed and marketed in the same manner following the June 2018 merger.

3

11.    All references to the acts and omissions of Defendant Monsanto in this Complaint shall mean and refer to the actions of Defendant Monsanto as well as any acts and omissions of Bayer AG on or after the date Defendant Monsanto became an indirect subsidiary of Bayer AG. Further Bayer AG is jointly and/or severally liable with Defendant Monsanto for all acts, omissions, and wrongdoing of Defendant Monsanto as set forth in this Complaint as a parent of Defendant Monsanto, as an affiliate of Defendant Monsanto and under the doctrine of successor liability by contract, the common law, or otherwise.

12.    Defendant "John Does" are the unknown individuals, companies, subsidiaries, parent companies, and entities which are at fault in this matter and as may be discovered through the use of the West Virginia Rules of Civil Procedure and/or the discovery process.

13.    Upon best information and belief, Defendants are entities that were involved in the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the herbicide "Roundup", containing the active ingredient glyphosate.

14.    During the period of time of Plaintiff-decedent's exposure, Defendants advertised and sold goods, specifically "Roundup" products, in Barbour County, West Virginia and surrounding counties, including, but not limited to Harrison County, Upshur County, and Randolph County.

4

15.    For the period of time regarding Plaintiff-decedent's exposure, Defendants transacted and conducted business within the State of West Virginia that relates to the allegations in this Complaint.

16.    Defendants have derived substantial revenue from all "Roundup" products used and sold in the State of West Virginia.

17.    Defendants expected or should have expected its acts to have consequences within the State of West Virginia.

18.    Defendants engaged in the business of designing, developing, manufacturing, testing, packaging, marketing, distributing, labeling, and/or selling "Roundup" and "Roundup" products.

19.    Upon information and belief, Defendants purposefully availed themselves of the privilege of conducting activities within the State of West Virginia, thus invoking the benefits and protections of its laws.

20.    Upon information and belief, Defendants did act to sell, advertise and/or distribute "Roundup" with full knowledge of its dangerous and defective nature.

## FACTUAL ALLEGATIONS

21.    At all relevant times, Defendant Monsanto was in the business of, and did, design, research, manufacture, test, advertise, promote, market, sell, distribute, and/or is

responsible for the other entities who promoted, marketed, sold and distributed the commercial herbicide "Roundup".

22.    Defendant Monsanto discovered the herbicidal properties of glyphosate during the 1970's and subsequently began to design, research, manufacture, sell and distribute glyphosate based "Roundup" as a broad-spectrum herbicide.

23.    Glyphosate is the active ingredient in "Roundup" which also contains water and a surfactant blend.

24.    Glyphosate is a broad-spectrum herbicide used to kill weeds and grasses.

25.    Glyphosate is a "non-selective" herbicide, meaning it kills indiscriminately based only on whether a given organism produces a specific enzyme, 5-enolpyruvylshikimic acide-3-phosphatge synthase, known as EPSP synthase.

26.    Glyphosate inhibits the enzyme 5-enolpyruvylshikimic acide-3-phosphate synthase that interferes with the shikimic pathway in plants, resulting in the accumulation of shikimic acid in plant tissue and ultimately plant death.

27.    When sprayed on the weeds, the surfactant blend helps reduce the surface tension of water, to keep the herbicide on the targeted weed. When sprayed, the plants absorb glyphosate directly through their leaves, stems, and roots, and detectable quantities accumulate in the plant tissues.

28.     Each year, approximately 250 million pounds of glyphosate are sprayed on crops, commercial nurseries, suburban lawns, ball fields, parks and golf courses. This increase in use has been driven largely by the proliferation of genetically engineered crops, crops specifically tailored to resist the activity to glyphosate.

29.     The original Defendant Monsanto Roundup, containing the active ingredient glyphosate, was introduced in 1974. Today's glyphosate products (now Bayer AG's) are among the world's most widely used herbicides. Defendant Monsanto's and/or Bayer AG's glyphosate products are registered in more than 130 countries and are approved for weed control in more than 100 crops. No other herbicide active ingredient compares in terms of number of approved uses. For more than 40 years, farmers, landowners and landscape developers across the globe, including Plaintiff-decedent, have used Roundup, unaware of its carcinogenic properties.


## REGISTRATION OF THE HERBICIDES UNDER FEDERAL LAW

30.     The manufacture, formulation and distribution of herbicides, such as Roundup, are regulated under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA"), 7. U.S.C. § 136 *et seq.* FIFRA requires that all pesticides be registered with the Environmental Protection Agency ("EPA") prior to their distribution, sale, or use, except as described by FIFRA 7 U.S.C. 136 a(a).

31.     The EPA requires as part of the registration process, among other requirements, a variety of tests to evaluate the potential for exposure to pesticides, toxicity to people and other potential non-target organisms, and other adverse effects on the environment. Registration by the EPA, however, is not an assurance or finding of safety. The determination the EPA makes in registering or re-registering a product is not that the product is "safe", but rather that use of the product in accordance with its label directions "will not generally cause unreasonable adverse effects on the environment." 7 U.S.C. § 136(a)(c)(5)(D).

32.     FIFRA defines "unreasonable adverse effects on the environment" to mean "any unreasonable risk to man or the environment, taking into account the economic, social, and environmental costs and benefits of the use of any pesticide." 7 U.S.C. § 136(b).   FIFRA thus requires the EPA to make a risk/benefit analysis in determining whether a registration should be granted or allowed to continue to be sold in commerce.

33.     The EPA registered Roundup for distribution, sale and manufacture in the United States and the State of West Virginia relied on the EPA's registration to allow the distribution, sale and use of Roundup within the State.

34.     FIFRA generally requires that the registrant, Defendant Monsanto, conduct health and safety testing of pesticide products.  The government is not required, nor is it able, to perform the product tests that are required of the manufacturer.

35.   The evaluation of each pesticide product distributed, sold, or manufactured is completed at the time the product is initially registered.   The data necessary for registration of a pesticide has changed over time.   The EPA is now in the process of re-evaluating all pesticide products through a Congressionally-mandated process called "re-registration."   7 U.S.C. § 136a-1.   In order to re-evaluate these pesticides, the EPA demands the completion of additional tests and the submission of data for the EPA's review and evaluation.

36.   In the case of glyphosate and Roundup, the EPA had planned on releasing its preliminary risk assessment-in relation to the registration process-no later than July 2015.   The EPA completed its review of glyphosate in early 2015 but delayed releasing the assessment pending further review in light of the World Health Organization's findings.

## DEFENDANT MONSANTO'S FALSE REPRESENTATIONS
## REGARDING THE SAFETY OF ROUNDUP®

37.   In 1996, the New York Attorney General ("NYAG") filed a lawsuit against Defendant Monsanto based on its false and misleading advertising of Roundup products. Specifically, the lawsuit challenged Defendant Monsanto's general representations that its spray-on glyphosate-based herbicides, including Roundup, were "safer than table salt" and "practically non-toxic" to mammals, birds, and fish.   Among the representations the

NYAG found deceptive and misleading about the human and environmental safety of Roundup are the following:

a.  Remember that environmentally friendly Roundup herbicide is biodegradable.  It won't build up in the soil so you can use Roundup with confidence along customers' driveways, sidewalks and fences...

b.  Remember that Roundup is biodegradable and won't build up in the soil.  That will give you the environmental confidence you need to use Roundup everywhere you've got a weed, bush, edging or trimming problem.

c.   Roundup biodegrades into naturally occurring elements.

d.  Remember that versatile Roundup herbicide stays where you put it.  That means there's no washing or leaching to harm customers' shrubs or other desirable vegetation.

e.  This non-residual herbicide will not wash or leach in the soil.  It...stays where you apply it.

f.  You can apply Roundup with "confidence because it will stay where you put it" it bonds tightly to soil particles, preventing leaching.  Then, soon after application, soil microorganisms biodegrade Roundup into natural products.

g.   Glyphosate is less harmful to rats than table salt following acute oral ingestion.

h. Glyphosate's safety margin is much greater than required. It has over a 1,000-fold safety margin in food and over a 700-fold safety margin for Workers who manufacture it or use it.

i. You can feel good about using herbicides by Defendant Monsanto. They carry a toxicity category rating of 'practically non-toxic' as it pertains to mammals, birds and fish.

j. "Roundup can be used where kids and pets will play and breaks down into natural material." This ad depicts a person with his head in the ground and a pet standing in an area which has been treated with Roundup.[1]

38.    On November 19, 1996, Defendant Monsanto entered into an Assurance of Discontinuance with NYAG, in which Defendant Monsanto agreed, among other things, "to cease and desist from publishing or broadcasting any advertisements [in New York] that represent, directly or by implication" that:

a. its glyphosate-containing pesticide products or any component thereof are safe, non-toxic, harmless or free from risk.

b. its glyphosate-containing pesticide products or any component thereof manufactured, formulated, distributed or sold by Defendant Monsanto are biodegradable.

---

[1] Attorney General of the State of New York, In the Matter of Defendant Monsanto Company, Assurance of Discontinuance Pursuant to Executive Law § 63 (15) (Nov.1996).

11

c.  its glyphosate-containing pesticide products or any component thereof stay where they are applied under all circumstances and will not move through the environment by any means.

d.  its glyphosate-containing pesticide products or any component thereof are "good" for the environment or are "known for their environmental characteristics."

e.  glyphosate-containing pesticide products or any component thereof are safer or less toxic than common consumer products other than herbicides;

f.  its glyphosate-containing products or any component thereof might be classified as "practically non-toxic."

39.   Defendant Monsanto did not alter its advertising in the same manner in any state other than New York, and, based on information and belief, still has not done so today.

40.   In 2009, France's highest court ruled that Defendant Monsanto had not told the truth about the safety of Roundup. The French court affirmed an earlier judgment that

Defendant Monsanto had falsely advertised its herbicide Roundup as "biodegradable" and that it "left the soil clean."[2]

## EVIDENCE OF CARCINOGENICITY IN ROUNDUP

41.   As early as the 1980's Defendant Monsanto was aware of glyphosate's carcinogenic properties.

42.   On March 4, 1985, a group of the Environmental Protection Agency's ("EPA") toxicology Branch published a memorandum classifying glyphosate as a Category C. oncogene.[3]  Category C oncogenes are possible human carcinogens with limited evidence of carcinogenicity.

43.   In 1986, the EPA issued a Registration Standard for glyphosate (NTIS PB87-103214).   The Registration standard required additional phytotoxicity, environmental fate, toxicology, product chemistry, and residue chemistry studies.  All of the data required was submitted and reviewed and/or waived.[4]

44.   In October 1991 the EPA published a Memorandum entitled "Second Peer Review of Glyphosate."  The memorandum changed glyphosate's classification to Group

---

[2]  *Defendant Monsanto Guilty in 'False Ad" Row,* BBC, Oct. 15, 2009, *available at* http://news.bbc.co.uk/2/hi/europe 8308903.stm.
[3]  Consensus Review of Glyphosate, Casewell No. 661A. March 4, 1985.  United States Environmental Protection Agency.
[4]  http://www.epa.gov/oppsrrd1/reregistration/REDs/factsheets/0178fact.pdf

E (evidence of non-carcinogenicity for humans).  Two peer review committee members did not concur with the conclusions of the committee and one member refused to sign.[5]

45.    In addition to the toxicity of the active molecule, many studies support the hypothesis that glyphosate formulations found that Defendant Monsanto Roundup products are more dangerous and toxic than glyphosate alone.[6]  As early as 1991 evidence existed demonstrating that glyphosate formulations were significantly more toxic than glyphosate alone.[7]

46.    In 2002, Julie Marc published a study entitled "Pesticide Roundup Provokes Cell Division Dysfunction at the Level of CDK1/Cyclin B Activation."

47.    The study found that Defendant Monsanto's Roundup caused delays in the cell cycles of sea urchins, while the same concentrations of glyphosate alone proved ineffective and did not alter cell cycles.

48.    In 2004, Julie Marc published a study entitled "Glyphosate-based pesticides affect cell cycle regulation."  The study demonstrated a molecular link between glyphosate-based products and cell cycle dysregulation.

49.    The study noted that "cell-cycle dysregulation is a hallmark of tumor cells and human cancer.  Failure in the cell-cycle checkpoints leads to genomic instability and

---

[5] Second Peer Review of Glyphosate, CAS No. 1071-83-6. October 30, 1881.  United States Environmental Protection Agency.
[6] Martinez, et al. 2007; Benachour 2009; Gasnier et al. 2010; Peixoto 2005; Marc 2004
[7] Martinez et al 1991

subsequent development of cancers from the initial affected cell." Further, "[s]ince cell cycle disorders such as cancer result from dysfunction of unique cell, it was of interest to evaluate the threshold dose of glyphosate affecting cells."[8]

50.    In 2005, Francisco Peixoto published a study showing that roundup's effects on rat liver mitochondria are much more toxic and harmful than the same concentrations of glyphosate alone.

51.    The Peixoto study suggested that the harmful effects of Roundup on mitochondrial bioenergetics could not be exclusively attributed to glyphosate and could be the result of other chemicals, namely the surfactant POEA, or alternatively due to the possible synergy between glyphosate and Roundup formulation products.

52.    In 2009, Nora Benachour and Grilles-Eric Seralini published a study examining the effects of Roundup and glyphosate on human umbilical, embryonic and placental cells.

53.    The study used dilution levels of Roundup and glyphosate far below agricultural recommendations, corresponding with low levels of residues in food.  The study concluded that supposed "inert" ingredients and possibly POEA, change human cell permeability and amplify toxicity of glyphosate alone.  The study further suggested that determinations of glyphosate toxicity should take into account the presence of adjuvants, or those chemicals used in the formation of the complete pesticide.  The study

---

[8] (Molinari, 2000; Stewart et al., 2003)

confirmed that the adjuvants in roundup are not inert and that Roundup is always more toxic than its active ingredient glyphosate.

54.    The results of these studies were confirmed in recently published peer-reviewed studies and were at all times available and/or known to Defendant.

55.    Defendant knew or should have known that Roundup is more toxic than glyphosate alone and that safety studies on Roundup, Roundup's adjuvants and "inert" ingredients and/or that surfactant POEA were necessary to protect Plaintiff-decedent from Roundup.

56.    Defendant knew or should have known that tests limited to Roundup's active ingredient glyphosate were insufficient to prove the safety of Roundup.

57.    Defendant failed to appropriately and adequately test Roundup, Roundups adjuvants and "inert" ingredients, and/or the surfactant POEA to protect Plaintiff from Roundup.

58.    Rather than performing appropriate tests, Defendant relied upon flawed industry-supported studies designed to protect Defendant's economic interests rather than Plaintiff-decedent and the consuming public.

59.    Despite their knowledge that Roundup was considerably more dangerous than glyphosate alone, Defendant continued to promote Roundup as safe.

## IARC CLASSIFICATION OF GLYPHOSATE

60.    The International Agency for Research on Cancer ("IARC") is the specialized intergovernmental cancer agency the World Health Organization ("WHO") of the United Nations tasked with conducting and coordinating research into the causes of cancer.

61.    An IARC Advisory Group to Recommend Priorities for IARC Monographs during 2015-2016 met in April 2014. Though nominations for the review were solicited, a substance must meet two criteria to be eligible for review by the IARC Monographs: there must already be some evidence of carcinogenicity of the substance, and there must be evidence that humans are exposed to the substance.

62.    IARC set glyphosate for review in 2015-2016. IARC uses five criteria for determining priority in reviewing chemicals. The substance must have a potential for direct impact on public health; scientific literature to support suspicion of carcinogenicity; evidence of significant human exposure; high public interest and/or potential to bring clarity to a controversial area and/or reduce public anxiety or concern; related agent similar to one given high priority by the above considerations. Data reviewed is sourced preferably from publicly accessible, peer-reviewed data.

63.    On March 24, 2015, after its cumulative review of human, animal and DNA studies for more than one (1) year, many of which have been in Defendant Monsanto's possession since as early as 1985, the IARC's working group published its conclusion

17

that the glyphosate contained in Defendant's Roundup herbicide, is a Class 2A "probable carcinogen" as demonstrated by the mechanistic evidence of carcinogenicity in humans and sufficient evidence of carcinogenicity in animals.

64.    The IARC's full Monograph was published on July 29, 2015 and established glyphosate as a class 2A *probable* carcinogen to humans.   According to the authors glyphosate demonstrated sufficient mechanistic evidence (genotoxicity and oxidative stress) to warrant a 2A classification based on evidence of carcinogenicity in humans and animals.

65.    The IARC Working Group found an increased risk between exposure to glyphosate and non-Hodgkin's lymphoma ("NHL") and several subtypes of NHL, and the increased risk continued after adjustment for other pesticides.

66.    The IARC also found that glyphosate caused DNA and chromosomal damage in human cells.

## EARLIER EVIDENCE OF GLYPHOSATE'S DANGER

67.    Despite the new classification by the IARC, Defendant Monsanto had ample evidence of glyphosate and Roundup's genotoxic properties for decades.

68.    Genotoxicity refers to chemical agents that are capable of damaging the DNA within a cell through genetic mutations, which is a process that is believed to lead to cancer.

18

69.     In 1997, Chris Clements published "Genotoxicity of select herbicides in *Rana catesbeiana* tadpoles using the alkaline single-cell gel DNA electrophoresis (comet) assay."

70.     The study found that tadpoles exposed to Roundup showed significant DNA damage when compared with unexposed control animals.

71.     Both human and animal studies have shown that glyphosate and glyphosate-based formulations such as Roundup can induce oxidative stress.

72.     Oxidative stress and associated chronic inflammation are believed to be involved in carcinogenesis.

73.     The IARC Monograph notes that "[s]trong evidence exists that glyphosate, AMPA and glyphosate-based formulations can induce oxidative stress."

74.     In 2006 Cesar Paz-y-Miño published a study examining DNA damage in human subjects exposed to glyphosate.

75.     The study produced evidence of chromosomal damage in blood cells showing significantly greater damage after exposure to glyphosate than before in the same individuals, suggesting the glyphosate formulation used during aerial spraying had a genotoxic effect on exposed individuals.

76.     The IARC Monograph reflects the volume of evidence of glyphosate pesticides' genotoxicity noting "[t]he evidence for genotoxicity caused by glyphosate-based formulations is strong."

77.     Despite knowledge to the contrary, Defendant Monsanto maintained that there is no evidence that roundup is genotoxic, that regulatory authorities and independent experts are in agreement that Roundup is not genotoxic, and that there is no evidence that Roundup is genotoxic.

78.     In addition to glyphosate and Roundup's genotox properties, Defendant Monsanto has long been aware of glyphosate's carcinogenic properties.

79.     Glyphosate and Roundup in particular have long been associated with carcinogenicity and the development of numerous forms of cancer, including, but not limited to, non-Hodgkin's lymphoma, Hodgkin's lymphoma, multiple myeloma and soft tissue sarcoma.

80.     Defendant Monsanto has known of this association since the early to mid 1980s and numerous human and animal studies have evidenced the carcinogenicity of glyphosate and/or Roundup.

81.     In 1985 the EPA studied the effects of glyphosate in mice finding a dose related response in male mice linked to renal tubular adenomas, a rare tumor. The study concluded the glyphosate was oncogenic.

82.     In 2003 Lennart Hardell and Mikael Eriksson published the results to two case controlled studies on pesticides as risk factor for NHL and hairy cell leukemia.

83.     The study concluded that glyphosate had the most significant relationship to NHL among all herbicides studies with an increased odds ratio of 3.11.

84.     In 2003, AJ De Roos published a study examining the pooled data of mid-western farmers, examining pesticides and herbicides as risk factors for NHL.

85.     The study, which controlled for potential confounders, found a relationship between increased NHL incidence and glyphosate.

86.     In 2008 Mikael Eriksson published a study a population based case-control study of exposure to various pesticides as a risk factor for NHL.

87.     This strengthened previous associations between glyphosate and NHL

88.     In spite of this knowledge, Defendant Monsanto continued to issue broad and sweeping statements suggesting that Roundup was, and is, safer than ordinary household items such as table salt, despite a lack of scientific support for the accuracy and validity of these statements and, in fact, voluminous evidence to the contrary.

89.     Upon information and belief, these statements and representations have been made with the intent of inducing Plaintiff-decedent, the agricultural community, and the public at large to purchase, and increase the use of Defendant Monsanto's Roundup

for all Defendant's pecuniary gain, and in fact did induce Plaintiff-decedent to use Roundup.

90.     Defendant made these statements with complete disregard and reckless indifference to the safety of Plaintiff-decedent and the general public.

91.     Notwithstanding Defendant's representations, scientific evidence has established a clear association between glyphosate and genotoxicity, inflammation, and an increased risk of many cancers, including, but not limited to NHL, Multiple Myeloma, and soft tissue sarcoma.

92.   Defendant Monsanto, knew or should have known that glyphosate is associated with an increased risk of developing cancer, including, but not limited to, NHL, Multiple Myeloma and soft tissue sarcomas.

93.     Defendant failed to appropriately and adequately inform and warn Plaintiff-decedent of the serious and dangerous risks associated with the use of and exposure to glyphosate and/or Roundup, including, but not limited to, the risk of developing NHL, as well as other severe and personal injuries which are permanent and/or long-lasting in nature, cause significant physical pain and mental anguish, diminished enjoyment of life, and the need for medical treatment, monitoring and/or medications.

94.     Despite the IARC's classification of glyphosate as a class 2A probable carcinogen, Defendant continue to maintain that glyphosate and/or Roundup is safe, non-carcinogenic, non-genotoxic, and falsely warrant to users and the general public that

22

independent experts and regulatory agencies agree that there is no evidence of carcinogenicity or genotoxicity in glyphosate and Roundup.

95.   Defendant has claimed and continue to claim that Roundup is safe, non-carcinogenic, and non-genotoxic.  Defendant continue to promote the use of Roundup in a large-scale basis.

96.   Defendant has claimed on its website that "[r]egulatory authorities and independent experts around the world have reviewed numerous long-term carcinogenicity and genotoxicity studies and agree that there is no evidence that glyphosate, the active ingredient in roundup brand herbicides and other glyphosate-based herbicides, causes cancer, even at very high doses, and that it is not genotoxic"[9]

97.   Ironically, the primary source for this statement is a 1986 report by the WHO, the same organization that now considers glyphosate to be a probable carcinogen.

98.   Glyphosate, and Defendant Monsanto's Roundup products in particular, have long been associated with serious side effects and many regulatory agencies around the globe have banned or are currently banning the use of glyphosate herbicide products.

---

[9] Backgrounder-Glyphosate: No Evidence of Carcinogenicity. Updated November 2014. (downloaded October 9, 2015)

99.     Defendant Monsanto's statements proclaiming the safety of Roundup and the distribution and sell of Roundup by Defendant in disregarding its dangers misled the public at large, in particular the Plaintiff-decedent.

100.    Despite Defendant's knowledge that Roundup was associated with an elevated risk of developing cancer, Defendant Monsanto's promotional campaigns focused on Roundup's purported "safety profile."

101.    Defendant's failure to adequately warn resulted in (1) Plaintiff-decedent using and being exposed to glyphosate instead of using another acceptable and safe method of controlling unwanted weeds and pests; and (2) scientists and physicians failing to warn and instruct consumers about the risk of cancer, including NHL, and other injuries associated with Roundup.

102.    Defendant failed to seek modification of the labeling of Roundup to include relevant information regarding the risks and dangers associated with Roundup exposure.

103.    The failure of Defendant to appropriately warn and inform the EPA has resulted in inadequate warnings in safety information presented directly to users and consumers.

104.    The failure of Defendant to appropriately warn and inform the EPA has resulted in the absence of warning or caution statements that are adequate to protect health and the environment.

105.   The failure of Defendant to appropriately warn and inform consumers has resulted in the directions for use that are not adequate to protect the health of humans and the environment as a whole.

## EMERGING EVIDENCE FROM PRIOR DEFENDANT MONSANTO TRIALS

106.   Of the many revelations that have emerged from prior Defendant Monsanto trials, it is alleged:

a.   Defendant Monsanto never conducted epidemiology studies for Roundup and its other formulations made with the active ingredient glyphosate to evaluate the cancer risks for users.

b.   Defendant Monsanto was aware that the surfactants in Roundup were much more toxic than glyphosate alone.

c.   Defendant Monsanto spent millions of dollars on covert public relations campaigns to finance ghostwritten studies and articles aimed at discrediting independent scientists whose work found dangers with Defendant Monsanto's herbicides.

d.   When the U.S. Agency for Toxic Substances and Disease Registry sought to evaluate glyphosate toxicity in 2015, Defendant Monsanto engaged the assistance of EPA officials to delay that review.

e.   Defendant Monsanto enjoyed a close relationship with certain officials within the Environmental Protection Agency (EPA), who have repeatedly backed Defendant Monsanto's assertions about the safety of its glyphosate products.

    f.      Defendant Monsanto internally had worker safety recommendations that called for wearing a full range of protective gear when applying glyphosate herbicides, but did not warn the public to do the same.

107.   By reason of the foregoing acts and omissions, Plaintiff seeks compensatory and punitive damages as a result of Plaintiff-decedent's use of and exposure to Roundup which caused or was a substantial contributing factor in causing Plaintiff-decedent to suffer from cancer, specifically NHL, and Plaintiff-decedent suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, affecting his enjoyment of life—injuries which led to his eventual death.

108.   By reason of the foregoing acts and omissions, Plaintiff-decedent was severely and permanently injured and had endured emotional and mental anguish, medical expenses, and other economic and non-economic damages prior to his death, resulting from the actions and inactions of the Defendant.

## DECEDENT'S EXPOSURE TO ROUNDUP

109.   Plaintiff-decedent, at the time of his death was a resident of 704 Croston School Road, Moatsville, Barbour County, West Virginia.

110.   Plaintiff-decedent, from approximately 2008 until 2016, used Roundup for its intended purpose multiple times a year on his 13-acre property.

111.   Plaintiff-decedent, from approximately 2004 to 2007, assisted his father-in-law, Delmas Croston, with spraying Roundup on the father-in-law's property.

112.   At both locations, Plaintiff-decedent sprayed Roundup following all safety and precautionary warnings that he was aware of during the course of use.

113.   Plaintiff-decedent's exposure to Roundup occurred primarily in Barbour County, West Virginia and the product was purchased from Defendant John Does in that county, as well as in Harrison County, West Virginia.

114.   On or about January 12, 2017, Plaintiff-decedent was diagnosed with diffuse large B-cell lymphoma (anaplastic variant), with a non-germinal center phenotype by the Hans algorithm.  He later died of the disease on December 30, 2018.

115.   As a result of his injuries, Plaintiff-decedent had incurred significant economic and non-economic damages, including his untimely death.

## FIRST CAUSE OF ACTION
### NEGLIGENCE

116.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

117.   Defendants had a duty to exercise reasonable care in the designing, researching, testing, manufacturing, marketing, supplying, promoting, packaging, sale, and/or distribution of Roundup into the stream of commerce, including a duty to assure that the product would not cause users to suffer unreasonable, dangerous side effects.

118.   Defendants failed to exercise ordinary care in the designing, researching, testing, manufacturing, marketing supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Roundup into interstate commerce that Defendants knew or should have known that using Roundup created a high risk of unreasonable, dangerous side effects, including, but not limited to, the development of NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as need for lifelong medical treatment, monitoring, and/or medications.

119.   The negligence by the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.   Manufacturing, producing, promoting, formulating, creating, and/or designing Roundup without thoroughly testing it;

b.   Failing to test Roundup and/or failing to adequately, sufficiently and properly test Roundup;

c.   Not conducting sufficient test programs to determine whether or not roundup was safe for use; in that Defendants herein knew or should have known that Roundup was unsafe and unfit for use by reason of the dangers to its users;

28

d.     Not conducting sufficient testing programs and studies to determine Roundup's carcinogenic properties even after Defendants had knowledge that Roundup is, was, or could be carcinogenic;

e.     Failing to conduct sufficient testing programs to determine the safety of "inert" ingredients and/or adjuvants contained within Roundup, and the propensity of these ingredients to render Roundup toxic, increase the toxicity of roundup, whether these ingredients are carcinogenic, magnify the carcinogenic properties of Roundup, and whether or not "inert" ingredients and/or adjuvants were safe for use;

f.     Negligently failing to adequately and correctly warn the Plaintiff-decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup;

g.     Negligently failing to petition the EPA to strength the warnings associated with Roundup;

h.     Failing to provide adequate cautions and warnings to protect the health of users, handlers, applicators, and persons who would reasonably and foreseeably come into contact with Roundup and/or consumed food and water contaminated with Roundup;

i.     Negligently marketing, advertising, and recommending the use of Roundup and/or GMO crops without sufficient knowledge as to its dangerous propensities;

j.     Negligently representing that Roundup was safe for use for its intended purpose, and/or that Roundup was safer than ordinary and common items such as table salt, when, in fact, it was unsafe;

k.     Negligently representing that Roundup had equivalent safety and efficacy as other forms of herbicides;

l.     Negligently designing Roundup in a manner, which was dangerous to its users;

m.     Negligently manufacturing Roundup in a manner, which was dangerous to its users;

n.     Negligently producing Roundup in a manner, which was dangerous to its users;

o.     Negligently formulating Roundup in a manner, which was dangerous to its users;

p.     Concealing information from the Plaintiff-decedent and others similarly situated, while knowing that Roundup was unsafe, dangerous, and/or non-conforming with EPA regulations;

q.     Improperly concealing and/or misrepresenting information from the Plaintiff-decedent, scientific and medical professionals, and/or the EPA, concerning the severity of risks and dangers of Roundup compared to other forms of herbicides;

r.     Negligently selling Roundup with a false and misleading label;

s.     Negligently failing to adequately and correctly warn the Plaintiff-decedent, the public, the medical and agricultural professions, and the EPA of the dangers of Roundup to those consumers that regularly eat and drink Roundup contaminated products; and

30

t.      Negligently failing to warn the Plaintiff-decedent, the public, the medical and agricultural professions, and the EPA the extent that consumers of food and drink are regularly consuming products contaminated with Roundup products and the levels and regularity thereof.

120.    Defendant Monsanto under-reported, underestimated, and downplayed the serious dangers of Roundup.

121.    Defendant Monsanto negligently and deceptively compared the safety risks and/or dangers of Roundup with common everyday foods such as table salt, and other forms of herbicides.

122.    Defendants were negligent and/or violated health and safety laws in the designing, researching, supplying, manufacturing, promoting, packaging distributing, testing, advertising, warning, marketing, and selling of Roundup in that they:

a.      Failed to use ordinary care in designing and manufacturing Roundup so as to avoid the aforementioned risks to individuals when Roundup was used as an herbicide;

b.      Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Roundup;

c.      Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Roundup;

d.      Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Roundup;

e.      Failed to warn Plaintiff-decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects including, but not limited to, the development of NHL;

f.      Failed to conduct adequate testing, clinical testing and post-marketing surveillance to determine the safety of Roundup;

g.      Failed to conduct adequate testing, clinical testing, and post-marketing surveillance to determine the safety of Roundup's "inert" ingredients and/or adjuvants;

h.      Negligently misrepresented the evidence of Roundup's genotoxicity and carcinogenicity;

i.      Failing to instruct on the use of proper personal protective equipment and clothing when using its products; and

i.      Were otherwise careless and/or negligent.

123.    Despite the fact that Defendants knew or should have known that Roundup caused, or could cause, unreasonably dangerous side effects, Defendant continued and continues to market, manufacture, distribute, and/or sell Roundup to consumers.

124.   Defendants knew or should have known that consumers such as the Plaintiff-decedent would foreseeably suffer injury as a result of their failure to exercise ordinary care, as set forth above.

125.   Defendants' violations of law and/or negligence were the direct proximate cause of Plaintiff-decedent's injuries, harm and economic loss, and death.

126.   As a result of the foregoing acts and omissions, the Plaintiff-decedent suffered from serious and dangerous side effects including, but not limited to, NHL, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, financial expenses for hospitalization and medical care, and death.

## SECOND CAUSE OF ACTION
## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

127.   Plaintiffs repeat, reiterate and, re-allege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

128.   At all times herein mentioned, Defendant Monsanto designed and/or researched and/or manufactured and/or tested and/or advertised and/or promoted and/or sold and/or distributed, Roundup as hereinabove described that was used by the Plaintiff-

decedent and/or have acquired the Defendant who have designed and/or researched and/or manufactured and/or tested and/or advertised and/or promoted and/or sold and/or distributed Roundup as hereinabove described that was used by the Plaintiff-decedent.

129.   Defendant Monsanto's Roundup was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and/or marketed by the Defendant.

130.   At those times, Roundup was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular the Plaintiff-decedent herein.

131.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Roundup.

132.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and/or distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendant manufacturers and/or suppliers, it was unreasonably dangerous, unreasonably dangerous in normal use, and it was more dangerous than an ordinary consumer would expect.

34

133.   At all times herein mentioned, Roundup was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendant. In particular, Defendant Monsanto's Roundup was defective in the following ways:

a.     When placed in the stream of commerce, Defendant Monsanto Roundup was defective in design and formulation and, consequently, dangerous to an extent beyond that which an ordinary consumer would anticipate.

b.     When placed in the stream of commerce, Defendant Monsanto Roundup was unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner.

c.     When placed in the stream of commerce, Defendant Monsanto Roundup contained unreasonably dangerous design defects and was not reasonably safe when used in a reasonably anticipated manner.

d.     Defendant Monsanto did not sufficiently test, investigate, or study its Roundup products.

e.     Exposure to Roundup presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the herbicide.

f.     Defendant Monsanto knew or should have known at the time of marketing its Roundup products that exposure to Roundup could result in cancer and other severe illnesses and injuries.

g.     Defendant Monsanto did not conduct adequate post-marketing surveillance of its Roundup products.

35

134. Defendant Monsanto knew, or should have known that at all times herein mentioned, its Roundup was in a defective condition, and was and is inherently dangerous and unsafe.

135. Plaintiff-decedent was exposed to Defendant Monsanto's Roundup without knowledge of Roundup's dangerous characteristics.

136. At the time of the Plaintiff-decedent's use of and exposure to Roundup, Roundup was being used for the purposes and in a manner normally intended, as a broad-spectrum herbicide.

137. Defendant Monsanto with this knowledge voluntarily designed its Roundup with a dangerous condition for use by the public, and in particular, the Plaintiff-decedent.

138. Defendant Monsanto had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

139. Defendant Monsanto created a product that was and is unreasonably dangerous for its normal intended use.

140. Defendants then marketed and promoted a product in such a manner so as to market it inherently defective as the product downplayed its suspected, probable, and established health risks inherent with its normal, intended use.

36

141.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed by Defendants was manufactured defectively in that Roundup left the hands of Defendant Monsanto in a defective condition and was unreasonably dangerous to its intended users.

142.   The Roundup designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which it was manufactured.

143.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed a defective product, which created an unreasonable risk to the health of consumers and to the Plaintiff-decedent, in particular, and Defendant is therefore strictly liable for the injuries sustained by the Plaintiff-decedent.

144.   Plaintiff-decedent could not, by the exercise of reasonable care, have discovered Roundup's defects herein mentioned or perceived its danger.

145.   By reason of the foregoing, the Defendants have become strictly liable to the Plaintiff-decedent for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Roundup.

146.   Defendant Monsanto's defective design, of Roundup amounts to willful, wanton, and/or reckless conduct by Defendants.

147.   Defects in Defendant Monsanto's Roundup were the direct and proximate cause or a substantial factor in causing Plaintiff-decedent's injuries.

148.   As a result of the foregoing acts and omission, Plaintiff-decedent developed NHL, and suffered severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, and death.

## THIRD CAUSE OF ACTION
## (STRICT PRODUCTS LIABILITY – FAILURE TO WARN)

149.   Plaintiff repeats, reiterates and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

150.   Defendants have engaged in the business of selling, testing, distributing, supplying, manufacturing, marketing, and and/or promoting Roundup, and through that conduct have knowingly and intentionally placed Roundup into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff-decedent who are exposed to it through ordinary and reasonably foreseeable uses.

151.   Defendants did, in fact, sell, distribute, supply, manufacture, and/or promote Roundup to Plaintiff-decedent.  Additionally, Defendants expected the Roundup that they were selling, distributing, supplying, manufacturing and/or promoting to reach – and

Roundup did, in fact, reach – consumers, including Plaintiff-decedent, without any substantial change in the condition of the product when it was initially distributed.

152.   At the time of the manufacture, Defendant Monsanto could have provided the warnings or instructions regarding the full and complete risks of Roundup and glyphosate-containing products because it knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

153.   At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and at the time Plaintiff-decedent was exposed to by inhalation and/or ingestion, and/or dermal absorption of the product.  The defective condition of Roundup was due in part to the fact that it was not accompanied by proper warnings regarding its carcinogenic qualities and possible side effects, including, but not limited to developing non-Hodgkin's lymphoma as a result of exposure and use.

154.   Roundup did not contain a warning or caution statement, which was necessary and, if complied with, was adequate to protect the health of those exposed in violation of 7 U.S.C. §136j(a)(1)(E).

155.   Defendants' failure to include a warning or caution statement which was necessary and/if complied with, was adequate to protect the health of those exposed, violated U.S.C. §136j(a)(1)(E) as well as the laws of the State of West Virginia.

156.   Defendant Monsanto could have amended the label of Roundup to provide additional warnings.

157.   This defect caused serious injury to Plaintiff-decedent who used Roundup in its intended and foreseeable manner.

158.   At all times herein mentioned, Defendants had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that the product did not cause users to suffer from unreasonable and dangerous side effects.

159.   Defendants labeled, distributed, and promoted the aforesaid product that it was dangerous and unsafe for the use and purpose for which it was intended.

160.   Defendant Monsanto failed to warn of the nature and scope of the side effects associated with Roundup, namely its carcinogenic properties and its propensity to cause or serve as a substantial contributing factor in the development of NHL.

161.   Defendants were aware of the probable consequences of the aforesaid conduct.  Despite the fact that Defendants knew or should have known that Roundup caused serious injuries, Defendants failed to exercise reasonable care to warn of the dangerous carcinogenic properties and side effect of developing NHL from Roundup exposure, even though these side effects were known or reasonably scientifically knowable at the time of distribution.  Defendants willfully and deliberately failed to avoid

the consequences associated with their failure to warn, and in doing so, Defendants acted with a conscious disregard for the safety of Plaintiff-decedent.

162.   At the time of exposure, Plaintiff-decedent could not have reasonably discovered any defect in Roundup prior through the exercise of reasonable care.

163.   Defendants, as the developer, manufacturers and/or distributors of the subject product, are held to the level of knowledge of an expert in the field.

164.   Plaintiff-decedent reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

165.   Had Defendants properly disclosed the risks associated with Roundup, Plaintiff-decedent would have avoided the risk of NHL by not using Roundup.

166.   The information that Defendants did provide or communicate failed to contain adequate warnings and precautions that would have enabled Plaintiff-decedent and similarly situated individuals, to utilize the product safety and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false, and misleading and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries associated with use of and/or exposure to Roundup and glyphosate; continued to promote the efficacy of Roundup, even after it knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or otherwise suppressed, through aggressive marking and

promotion, any information or research about the risks and dangers of exposure to Roundup and glyphosate.

167. To this day, Defendant Monsanto has failed to adequately warn of the true risks of Plaintiff-decedent's injuries associated with the use of and exposure to Roundup.

168. As a result of their inadequate warnings, Defendant's Roundup is defective and unreasonably dangerous when they left the possession and/or control of Defendant Monsanto, and sold and distributed by Defendants.

169. As a direct and proximate result of Defendants' actions as alleged herein, and in such other ways to be later shown, the subject product caused Plaintiff-decedent to sustain injuries as herein alleged.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTIES

170. Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

171. At all times herein mentioned, the Defendants manufactured, distributed, compounded, recommended, merchandized, advertised, promoted, and sold Roundup and/or have recently acquired the Defendants who have manufactured, compound portrayed, distributed, recommended, merchandized, advertised, promoted, and sold

Roundup, as a broad-spectrum herbicide. These actions were under the ultimate control and supervision of Defendant.

172.   At the time Defendants marketed, sold, and distributed Roundup for use by Plaintiff-decedent, Defendants knew of Roundup's intended use and impliedly warranted the product to be of merchantable quality and safe and fit for this use.

173.   The Defendants impliedly represented and warranted to Plaintiff-decedent and users of Roundup, the agricultural community, and/or the EPA that Roundup was safe and of merchantable quality and fit for the ordinary purpose for which it was to be used.

174.   These representations and warranties were false, misleading, and inaccurate in that Roundup was unsafe, unreasonably dangerous, not of merchantable quality, and defective.

175.   Plaintiff-decedent did rely on said implied warranty of merchantability of fitness for particular use and purpose.

176.   Plaintiff-decedent reasonably relied upon the skill and judgment of Defendants as to whether Roundup was of merchantable quality and safe and fit for its intended use.

177.   Roundup was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition, and the products' materials were

expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

178.    The Defendants breached the aforesaid implied warranties, as the herbicide Roundup was not fit for its intended purposes and uses.

179.    As a result of the foregoing acts and omissions, Plaintiff-decedent suffered from NHL and suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages, and death.

## FIFTH CAUSE OF ACTION

## UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

180.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

181.    Plaintiff-decedent has suffered damages due to the actions of Defendants under the West Virginia Consumer Credit and Protection Act, W.Va. Code §§ 46A-6-101 et seq., and more specifically as follows:

a.  Fraudulent or deceptive acts or representations were made by Defendants, their employees, agents and/or servants as to the safety of their glyphosate containing herbicides and GMO crops.

44

b.  Defendants caused confusion and misunderstanding as to the source, sponsorship, approval or certification of their goods, including glyphosate containing herbicides and GMO crops;

c.  Defendants caused confusion and misunderstanding as to their affiliation, connection or association with, or certification by the EPA and others;

d.  Defendants represented that their goods have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have;

e.  Making false or misleading statements of fact regarding its product;

f.  Engaging in other fraudulent or deceptive conduct which created confusion and/or misunderstanding; and

g.  Glyphosate is never used in its pure form – it's always mixed with additives (adjuvants) that are toxic in their own right. So comparisons based on the pure chemical made by the Defendants are and were meaningless.

182.   As a result of the foregoing acts and omissions, Plaintiff-decedent suffered from NHL and suffered severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, financial expenses for hospitalization and medical care, including medical expenses and other economic, and non-economic damages, and death.

## SIXTH CAUSE OF ACTION

## SURVIVAL ACTION

183.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect all if more fully set forth herein.

184.   As a direct and proximate result of the conduct of Defendants, Plaintiff-decedent, prior to death, was obligated to spend various sums of money to treat his injuries, which debts have been assumed by the Estate.  As a direct and proximate cause of aforesaid, Plaintiff-decedent was caused pain and suffering, mental anguish, and impairment of the enjoyment of life, until the date of his death: and, as a direct and proximate result of the aforesaid, Plaintiff-decedent suffered a loss of earning capacity. Plaintiff's bring this claim on behalf of the Estate of Jonathan Correl Croston under all applicable statutory and/or common law.

185.   As a direct and proximate result of the aforesaid, and including the observance of the suffering and physical deterioration of the Plaintiff-decedent until the date of his death, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and medical treatment. Plaintiff's bring this claim on behalf of the Estate of Jonathan Correl Croston under all applicable statutory and/or common law.

## SEVENTH CAUSE OF ACTION
## <u>WRONGFUL DEATH</u>

186.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

187.   Plaintiff brings this claim, on behalf of the Estate of Jonathan Correl Croston and for the benefit of the Plaintiff-decedent's lawful beneficiaries.

188.   As a direct and proximate result of the Defendants' actions and the defective nature of Roundup, as outlined above, Plaintiff-decedent suffered bodily injury resulting in pain and suffering, disability to earn, funeral expenses and death.

189.   As a direct and proximate cause of the Defendants' conduct, Plaintiff-decedents Estate and beneficiaries have incurred hospital, nursing and medical expenses, and estate administration expenses as a result of his death.   Plaintiff brings this action on behalf of Plaintiff-decedents' lawful beneficiaries for these damages and for all pecuniary losses under applicable state statutory and/or common laws.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, the Plaintiff demands judgment against the Defendants for the following relief:

1. General damages for the physical pain, mental suffering, and emotional distress suffered by Jonathan Correl Croston from the time of diagnosis to his death;

2. Damages permitted to be recovered under the West Virginia Wrongful Death Act, including but not necessarily limited to:

   A. Sorrow, mental anguish, and solace which may include society, companionship, comfort, guidance, kindly offices and advise of the decedent;

   B. Compensation for reasonably expected loss of (i) income of the decedent and (ii) services, protection, care and assistance provided by the decedent; and/or

   C. Reasonable funeral expenses and any other economic losses related to the death of Jonathan Correl Croston;

3. Compensatory damages in an amount that exceeds the jurisdictional requirements of this Court including, but not limited to, damages and expenses for medical care and treatment, loss of earning capacity and/or lost income, all in an amount to be determined by the jury;

4. All other statutory or other damages allowed by law;

5. Punitive or exemplary damages as permitted by West Virginia law;

6. Pre-judgment and post judgment interest;

7. Costs and attorney's fees and all other damages allowed by law; and/or

8. Such other further specific and general relief as may become apparent from discovery as this matter matures for trial or as justice requires.

48

## REQUEST FOR JURY TRIAL

Plaintiff requests a jury trial on all questions of fact raised in this Complaint.

**PLAINTIFFS**
**By Counsel**

Hunter B. Mullens, WV Bar No. 7620
C. Brian Matko., WV State Bar No. 7995
**MULLENS & MULLENS, PLLC**
9 North Main Street
PO Box 95
Philippi, WV 26416
Telephone: (304) 457-9000
Facsimile: (304) 457-9002
hmullens@mullensandmullens.com
bmatko@mullensandmullens.com

**EXHIBIT**
**No. 1**

# United States of America



**State of West Virginia**

**County of Barbour, ss:**

# Letter of Administration

## Estate of JONATHAN CORREL CROSTON

I, CONNIE L KAUFMAN, Clerk of the Barbour County Commission, in the State of West Virginia, do hereby certify that JULIE CROSTON was on the 18th day of November, 2019, appointed by the Barbour County Commission as administratrix(s) of the Estate of JONATHAN CORREL CROSTON, duly qualified as such by taking oath prescribed by law, and by giving approved bond in the sum of $0.00, as required by law.

NOW THEREFORE, be it known that said appointment is now in full force and effect and that full faith and credit are due and should be given to all the acts of the said JULIE CROSTON as such administratrix(s) of the Estate of JONATHAN CORREL CROSTON, as well in all jurisdictions, as elsewhere.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed the seal of the Barbour County Commission at my office in said County on the 18th day of November, 2019.

*Connie Kaufman*

CONNIE L KAUFMAN
Clerk of the Barbour County Commission



By _____

Connie Kaufman
County Clerk

**CERTIFIED MAIL**

POSTAGE >> PITNEY BOWES

ZIP 25311   $ 008.05
02 4W
0000336734 JAN 06 2021